Matter of A.F. (L.F.) (2025 NY Slip Op 50145(U))

[*1]

Matter of A.F. (L.F.)

2025 NY Slip Op 50145(U)

Decided on February 4, 2025

Family Court, New York County

Wilkofsky, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 4, 2025
Family Court, New York County

In the Matter of A.F., J.F., Children Under Eighteen years of Age Alleged to be Neglected by L.F., Respondent.

File No.: xxxxx

Special Assistant Corporation Counsel Swatanter Polce, for the NYC Administration for Children's Services
Alexandra Rosin, Center for Family Representation, attorney for the respondent mother
Brad Martin, The Legal Aid Society, attorney for the subject children

Yael Wilkofsky, J.

On or about April 21, 2022, the petitioner Administration for Children's Services ("ACS") filed Family Court Act ("FCA") Article 10 neglect petitions against the respondent mother L.F. ("respondent mother" or "L.F.") on behalf of the subject children J.F., age 5, and A.F., age 7 (the "subject children"). The petitions allege, inter alia, that the respondent mother neglected the subject children by failing to provide them with proper supervision or guardianship in that she suffers from a mental illness which impairs her ability to care for the subject children.
On April 21, 2022, at intake on the petitions, the respondent mother failed to appear and the Court remanded the subject children to the care and custody of the Commissioner of ACS. The subject children were then placed in the care of their maternal great aunt (the "maternal great aunt"). On or about April 25, 2022, the respondent mother appeared in court, was assigned [*2]counsel and requested a hearing pursuant to FCA § 1028. A 1028 hearing was held, at the conclusion of which the Court denied the respondent mother's application, finding that the petitioner established that the subject children would be at imminent risk of harm if returned to the respondent mother's care.
Thereafter, a full fact-finding hearing was held at which petitioner presented documentary and testimonial evidence. The respondent mother also testified at the hearing. In a decision entered on February 13, 2024, the Court found that the petitioner established, by a fair preponderance of the evidence, that the respondent mother neglected the subject children on the ground that she failed to provide the subject children with proper supervision or guardianship in that she suffers from a mental illness that impaired her ability to care for the subject children. The Court then entered findings of neglect against the respondent mother based only upon allegations 1(a) and 1(c) in the petition, specifically, that the respondent mother has a diagnosis of bipolar disorder and depression, that she is prescribed psychotropic medication, that in or around March 2022, the respondent mother stopped attending her psychiatric appointments and stopped taking her prescribed medication, and that on or about April 21, 2022, the respondent mother reported that she is going through things mentally and needs a break and that she would shoot up NYC if she did not get her children back.
A dispositional hearing commenced on June 10, 2024, continued on August 12, 2024 and September 20, 2024, and concluded on December 18, 2024. On December 18, 2024, the Court reserved decision and adjourned the matter until February 5, 2025. At the hearing, the petitioner introduced into evidence the two neglect petitions, redacted to include only allegations 1(a) and 1(c), the February 13, 2024 fact-finding order, the February 7, 2024 permanency hearing order, an agency court report dated May 3, 2024, an agency court report dated June 7, 2024, a court order dated January 18, 2024 and an Observation and Evaluation (Supervised Visitation) Report written by E.W., Ph.D. ("Dr. E.W."), dated August 9, 2024. The petitioner also called as witnesses the agency case worker ("agency case worker" or "Ms. G.") and the maternal great aunt. The petitioner then rested at which point the respondent mother introduced into evidence an October 25, 2023 letter from her social worker at the Henry Street Settlement, her certification of completion of her "Parenting Discoveries" course, dated August 17, 2023, and five letters from the Emma L. Bowen Community Service Center ("Emma Bowen") about the respondent mother's engagement in mental health services, dated October 18, 2023, January 12, 2024, February 4, 2024, April 8, 2024 and June 6, 2024. The respondent mother testified on her own behalf, and she was her only witness. The attorney for the children did not present any evidence or call any witnesses to testify at the hearing.
The documentary evidence, upon which the Court relies, establishes as follows. On January 18, 2024, the Court ordered the agency to "locate and pay for a licensed clinical social worker approved by the Appellate Division First or Second Department to supervise three (3) visits between the [respondent mother] L.F. and the subject children A.F. and J.F. and prepeare (sic) a report for the court and counsel indicating the quality of visitation, any safety issues that arose and any other pertinent information for the court." Additionally, in the February 7, 2024 permanency hearing order, the Court made a finding that the agency made reasonable efforts to effectuate the goal of placement with a fit and willing relative by attempting to set up in-person visits between the respondent mother and the subject children, by following up regarding the respondent mother's mental health services and parenting skills classes, and by retaining a private psychologist to supervise visits between the respondent mother and the subject children.
The May 3, 2024 St. Dominic's Family Services court report, written by the agency case worker, Ms. G., states as follows. The maternal great aunt has identified herself as a long-term resource for the subject children and has expressed interest in pursuing kinship guardianship or adoption for the subject children. A.F. does not wish to return to her mother's home but wishes to continue residing with her maternal great aunt. With regards to services, on August 17, 2023, the respondent mother completed her parenting class, on September 22, 2023, the respondent mother completed a psychological assessment, and on September 27, 2023, the respondent mother completed an intake appointment for mental health services. The respondent mother was assigned a therapist in December 2023 and she has been consistently attending her therapy appointments. The respondent mother was diagnosed with major depressive disorder and she is working on anger management techniques to help her cope with her trauma responses. The agency is unable to inquire about the respondent mother's progress in her programs directly from the providers themselves because the respondent mother has refused to sign HIPAA releases. The respondent mother's agency-supervised in-person visits are scheduled for Tuesdays and Wednesdays from 4:30-6:00 p.m. but she has not been visiting consistently. Specifically, the respondent mother only visited with the subject children once in the month prior to May 3, 2024 and the respondent mother informed the agency that she prefers to have virtual visitation with the subject children rather than in-person visitation.
Additionally, the Court relies on the June 7, 2024 St. Dominic's Family Services court report, written by the agency case worker, Ms. G., which states much of the same information that was stated in the May 3, 2024 court report with the exception of the following information. The respondent mother is still scheduled to have her agency-supervised in-person visits with the subject children on Tuesdays and Wednesdays from 4:30-6:00 p.m. The respondent mother has continued to visit inconsistently in that since the court appearance held on April 10, 2024, the respondent mother has attended a total of two visits at the agency, one on April 16, 2024 and the other on May 29, 2024. Additionally, the respondent mother informed the agency that she has to work long hours at work and is not able to come to the agency for her weekly visits. Further, the maternal great aunt informed the agency that she does not feel comfortable supervising any visits due to the respondent mother's combative behavior towards her. The respondent mother has also requested virtual visitation but has not been consistent in attending. In December 2023, the respondent mother requested that her mother-in-law be cleared as a visitation resource. However, in January 2024, the agency determined that her mother-in-law could not be cleared as a visitation resource due to the results of her criminal background check. Although the agency informed the respondent mother that she could propose additional visitation resources for the agency to clear, she has not done so.
The August 9, 2024 observation report written by Dr. E.W. states as follows. Pursuant to the Court's January 18, 2024 order, visits between the respondent mother and the subject children were supervised by Dr. E.W. on March 7, 2024, June 6, 2024 and August 1, 2024. There was a visit scheduled for April 25, 2024, which was cancelled because the respondent mother said she could not make it, and there was a visit scheduled for June 27, 2024, which was canceled due to the late arrival of A.F. from the school bus. The first two visits took place in the library and the second visit took place in the community outside at the park. At the conclusion of the three visits, Dr. E.W. summarized her observations in her report as follows:
"[L.F.] did display some capacity for warm and positive interactions with her children, and in many moments, she spoke to them gently and appropriately, showing affection, as [*3]when she held J.F. in her lap and swang (sic) with him at the playground, or when she sat with the children and praised them as they played computer games. Aside from these positive moments, there were also moments in which [L.F.] appeared angry at the children and spoke loudly and aggressively to them, and lacked constructive approaches to setting limits. For example, at the most recent visit at the playground, she yelled several times at both children — e.g., shouting at J.F., "Stop rubbing your friggin' face" and when J.F. cried, showing no empathy and instead asking him, "Why are you crying?" In the first visit which took place at the library, [L.F.] appeared preoccupied with A.F. not sitting in a certain way, given that she was wearing a skirt. She then appeared angry at A.F. and told her, "You're not acting your age, you're acting like you're 4 years old," to which A.F. replied, "I am 6 years old." [L.F.] continued, "A 6 year old knows to keep their legs closed when they got a dress on, ask that lady right there." [L.F.] also appeared distracted at times and towards the end of one visit at the library, she went to another area of the library, where she was out of sight and earshot of the children, who remained with the evaluator. On a final note, at times, [L.F.] smiled and giggled to herself, and although the evaluator wondered about the possibility that she was responding to internal stimuli (e.g., hallucinations or preoccupying thoughts), there was no definitive evidence for this."
An October 25, 2023 letter from the respondent mother's social worker at Henry Street Settlement states that the respondent mother completed her parenting class at Henry Street Settlement, which began on July 13, 2023 and ended on August 17, 2023. The letter further states that during the parenting class, the respondent mother participated in discussions, answered questions and interacted with other participants while addressing topics including stress management and self-care, effective communication skills, positive discipline strategies and others.
Finally, the letters from the respondent mother's therapist from Emma Bowen detail that the respondent mother was diagnosed with major depressive disorder, that the respondent mother has consistently been engaging in her therapy sessions and that the respondent mother is learning new coping skills and anger management techniques to help her with her everyday routines. However, the Court notes that many of the substantive statements in the letters are repeated word for word throughout the letters and that the letters do not include any information about whether the sessions are addressing the underlying allegations that led to the findings of neglect made against the respondent mother in February 2024.
The Court also relies on the following testimonial evidence. The agency case worker, Ms. G. credibly testified as follows. Ms. G. is employed by St. Dominic's Family Services foster care agency as a case worker for the family. The respondent mother's service plan consists of a mental health evaluation, individual therapy, which incorporates anger management skills, parenting classes and compliance with visitation. The respondent mother completed her parenting classes with Henry Street Settlement and the agency received a copy of the certificate of completion. During the parenting class, the respondent mother participated in discussions with other participants about topics including stress management, self-care and positive discipline strategies. In September 2023, the respondent mother completed intake for mental health services at Emma Bowen, in December 2023, she began weekly therapy sessions, and she has attended consistently since the therapy began. Ms. G. has not received any information regarding [*4]any recent mental health evaluation, including a psychiatric evaluation, conducted for the respondent mother and is not aware of any recent mental health diagnoses given to the respondent mother or whether medication has been prescribed to the respondent mother. This is because Ms. G. has been unable to speak directly with any of the respondent mother's mental health services providers as the respondent mother has refused to provide the agency with signed HIPAA releases. However, as far as Ms. G. is aware, the respondent mother is not taking any medication.
Ms. G. further credibly testified as follows. The respondent mother has agency-supervised in-person visitation scheduled with the subject children at the agency on Tuesdays and Wednesdays from 4:30-6:00 p.m. However, the respondent mother is not consistently attending the visits, despite Ms. G's regular outreach to the respondent mother inquiring about her attendance. The respondent mother requested virtual visitation in lieu of in-person visitation with the subject children because she reported that it was difficult for her to get to the agency due to her full-time job and that her work schedule is unpredictable. However, the respondent mother never provided Ms. G. with any documentation or details about her work schedule and she never suggested specific days of the week or times that might work with the respondent mother's schedule in order to have in-person visitation with the subject children. The respondent mother also requested virtual visitation instead of in-person visitation when the weather was bad as she reported that the subject children are prone to getting sick in bad weather. Ms. G. facilitated virtual visitation and approximately two virtual visits were supervised by the agency. The respondent mother calls the subject children on the maternal great aunt's phone and sometimes does video visits with them, all supervised by the maternal great aunt. The respondent mother attended the subject children's birthdays as well as A.F.'s graduation ceremony and interacted appropriately with the subject children at the funeral of a family member in September 2024. No safety concerns were reported to the agency after the visits.
Ms. G. also credibly testified as follows. Ms. G. has been unable to conduct a visit to the respondent mother's home to ensure that it is safe and appropriate for the subject children because the respondent mother has continued to refuse to inform the agency of her address. The last known address that the agency has for the respondent mother is no longer her address and the agency has no information as to where the respondent mother currently resides. On June 5, 2024, at a case planning conference, the respondent mother told Ms. G. that she did not understand why the agency needed to conduct a home visit even though the agency explained to the respondent mother why it was necessary.
Ms. G. further credibly testified as follows. The subject child J.F. is receiving speech therapy, which was recommended following his Individualized Education Program ("IEP") meeting held in September 2023. Ms. G. became aware that J.F. was having speech issues as early as April 2023, but she had great difficulty getting the respondent mother's consent to get the IEP evaluation for J.F. The respondent mother told Ms. G. that she did not want to sign the consents because she did not think J.F. needed services. Ms. G. has seen a lot of progress in J.F.'s speech since he started speech therapy. Additionally, Ms. G. regularly speaks with the subject children and since July 2023, A.F. has consistently stated that she wants to continue residing with her maternal great aunt.
Finally, Ms. G. credibly testified that pursuant to the Court's January 18, 2024 order, the agency located and paid for a licensed clinical social worker to observe three visits between the respondent mother and the subject children and report on the quality of the visitation and any [*5]safety concerns that arose during the visits. The first visit that the social worker observed occurred on March 7, 2024, the second, which was supposed to occur in April 2024, did not occur and was rescheduled to June 6, 2024, and the third visit occurred in August 2024.
The subject children's maternal great aunt credibly testified at the hearing as follows. The respondent mother visits with the subject children whenever she decides she wants to. In the month of September 2024, the respondent mother called the subject children approximately five times but was not able to speak with them all five times because on one occasion, they were sleeping, and on another occasion, the maternal great aunt was not available. Also in September 2024, the respondent mother visited the subject children in person only once at the maternal great aunt's home and saw them a second time that month at a family funeral. In the month of October 2024, the respondent mother did not visit with the subject children in person at the maternal great aunt's home at all. In the month of November 2024, the respondent mother attempted to visit the subject children in person only once when the maternal great aunt cooked a dinner for the respondent mother's birthday at her home, but because the respondent mother arrived late, the subject children were already sleeping and the respondent mother did not get to visit with them. The visits between the respondent mother and the subject children are inconsistent but appropriate.
The respondent mother also testified at the hearing but the Court found her testimony to be only partially credible. She testified as follows. With regards to visitation with the subject children, the respondent mother is permitted in-person, video and telephone contact with the subject children. The respondent mother calls the maternal great aunt on the telephone or via video call to speak to the subject children at night before they go to sleep and during the day, and she reaches out when she can or when she wants to. A.F. usually comes to the phone to speak with the respondent mother but J.F. does not always as he is sometimes asleep or playing on his electronic device. The respondent mother visited with the subject children in the month of November 2024 but did not visit in December 2024 because it was cold and she did not know what to do with them. The respondent mother prefers in-person visitation in the community rather than at the agency because during visits at the agency, there is nothing to do and A.F. becomes bored and would rather be outside. During the agency visits, the respondent mother mostly lets the subject children play on her phone or do puzzles. During visits in the community, she joins the subject children in the park, they dance, play hopscotch, go on the swings and play in the water. Regarding the three visits that were observed by Dr. E.W., two of the visits took place in the library and the third visit took place outside in the community. The respondent mother wanted all three visits to be in the community so that she could make memories with the subject children. The respondent mother testified that the visits observed by Dr. E.W. went well but that since those visits, she has not been visiting with the subject children consistently because she has not had time and the weather has not been good.
The respondent mother further testified as follows. Since the subject children were removed from her care, the agency has asked the respondent mother to engage in therapy and a parenting course. She completed the parenting course and received a certificate of completion. The respondent mother has been engaged in weekly individual therapy at Emma Bowen for a long time. The respondent mother only stopped attending her therapy sessions when her therapist left and no therapist was found to replace her. The respondent mother was then assigned a new therapist and speaks to her every Tuesday or whenever the respondent mother can call her. The respondent mother is only engaged in therapy now because of "threat and coercion" and not [*6]because she wants to engage in therapy. During her therapy sessions, the respondent mother discusses missing her children, wanting her children back, and "all of the BS and lies and what the court is doing." The respondent mother has been diagnosed with depression and anxiety but she does not believe she is bipolar. Her depression stems from past traumas, including family members passing away, and she is not currently prescribed any medication. The respondent mother would not agree to sign any HIPAA release that would give any information to Ms. G. because she does not trust Ms. G. as Ms. G. lied when she testified that A.F. did not want to go to the agency for visits. However, that testimony was not credible as the respondent mother herself testified that A.F. does not like visiting at the agency because she thinks it is boring.
The respondent mother further testified as follows. She lives in the Bronx in a two-bedroom apartment with two emotional support service dogs. The respondent mother has a full time job as a caretaker for people who have mental illness and sometimes she is on call. Her employer would be able to accommodate her schedule if the subject children were released to her care. If the subject children were released to her care, they would have their own room, A.F. would remain in her current school, the respondent mother might switch J.F. to a different school and she would continue to take them to their current pediatrician. If the subject children were released to her care, she would take them to Chuck E. Cheese, take them out to eat, take them to the movies and take them to visit with family members. However, that testimony was not entirely credible as no explanation was provided as to why the respondent mother has not been taking the subject children to those places, even though she is permitted to have agency-supervised visits in the community. When asked whether she would allow the agency to conduct a home visit to ensure that her home is safe and appropriate, the respondent mother testified that she would not allow anyone from the agency into her home. When asked whether she would abide by a court order requiring her to allow the agency into her home to conduct a home visit, the respondent mother said she would only comply if the person conducting the visit signs a contract stating that that they would not disclose her private information to anyone because her private life has nothing to do with this case and she should not have to tell anyone where she lives since she does not know where anyone in the court room resides. If the subject children were released to her care, the respondent mother would continue to engage in her individual therapy and she would engage in an anger management course only if the agency paid for it, but she prefers a group anger management class.
Finally, the respondent mother testified that she and A.F. have a good, mother-daughter relationship but they are not best friends because, unlike the maternal great aunt, the respondent mother does not give A.F. whatever she wants and does not do whatever A.F. wants her to do. The respondent mother testified that she expresses to A.F. that she does not like A.F.'s behavior at times and A.F. gets upset. The respondent mother further testified that she loves J.F. and that he is her best friend.
Pursuant to FCA § 1052 (a)(iii), at the conclusion of a dispositional hearing pursuant to Article 10, the Court may place the child in the care and custody of the Commissioner of ACS. "The paramount issue in a dispositional hearing is the best interest of the child." In re Marie Annette M., 23 AD3d 167, 169 (1st Dept 2005). Indeed, "[i]n making a determination of placement, Family Court must consider all the facts and circumstances relevant to the child's best interest." Id.; see also Matter of Giselle H., 22 AD3d 578, 580 (2d Dept 2005) ("the relevant inquiry concerns the [parent's] capacity to properly supervise the child and the potential for future neglect based on current information"). Moreover, "there is no presumption that [the [*7]child's best] interests will be best served by a return to the parent." Matter of Giselle H., 22 AD3d at 580.
After the full dispositional hearing, and a thorough review of all the testimony and documentary evidence submitted, the Court finds that placement of the subject children in the care and custody of the Commissioner of ACS is in the subject children's best interests. As an initial matter, although the respondent mother completed her parenting skills course and asserts that she is consistently attending her individual therapy sessions, she has still not completed anger management and has refused to sign HIPAA releases to verify her engagement in services. The neglect findings made against the respondent mother are based on evidence that she suffered from a mental illness that impaired her ability to care for the subject children. However, the agency has been unable to verify, on its own, whether the respondent mother is indeed engaged in mental health services, whether she has had a recent mental health evaluation, including a psychiatric evaluation, whether she has been prescribed medication and whether her service providers are adequately addressing the underlying allegations that led to the findings of neglect made against the respondent mother.
Additionally, placement of the subject children is in their best interests as the evidence adduced at the hearing establishes that although the respondent mother visits with the subject children on occasion, she does not visit consistently. While it was evident from the testimony that the respondent mother loves her children, the respondent mother is permitted to have agency- and resource-supervised visitation with the subject children at the agency, at the maternal great aunt's home and in the community but she does not regularly avail herself of those opportunities to see her children. Indeed, the evidence establishes that the respondent mother has declined to visit with the subject children at the agency, apparently because A.F. does not enjoy visiting there, and the respondent mother believes there is nothing for them to do during the visits, that the respondent mother visits the subject children at the maternal great aunt's home only when she has time and when she feels like visiting, and that the respondent mother visits the subject children in the community only sporadically and only when the weather is good. The evidence establishes that the respondent mother has not prioritized visiting with the subject children in person, regardless of where the visits take place, and that she has not made efforts to make in-person visitation work with her employment schedule. Moreover, visitation in the community does not require the respondent mother to visit with the subject children outside, if weather is indeed the barrier to the visits in the community going forward, as the respondent mother testified. To the contrary, the respondent mother can visit with them at the library, at a shopping mall, or at a restaurant, yet the respondent mother has chosen only to sporadically visit with the subject children in person based on when she feels like she wants to see them. The evidence establishes that the only barrier to the respondent mother consistently visiting with the subject children is the respondent mother herself.
Additionally, placement of the subject children is in their best interests as a release of the subject children to the care and custody of the respondent mother would require cooperation with ACS, including supervision and monitoring of the respondent mother's home, as well as compliance with Court orders, which, the evidence establishes, the respondent mother is either unable, or unwilling, to do. The respondent mother has made it clear that she wants the subject children released to her care, which is the reason that the Court ordered that the agency conduct a visit to the respondent mother's home, and the Court has explained the importance of the home visit to the respondent mother on numerous occasions. However, the respondent mother has [*8]refused to allow the agency to visit her home and has refused to provide the agency with her address. Moreover, the respondent mother's demand that the agency sign a contract prior to being allowed into her home is inappropriate and demonstrates a lack of insight into the need for the agency to ensure the subject children's safety were they to be released to the respondent mother's care and the reasons the findings of neglect were made against the respondent mother in the first place.
Further, placement of the subject children is in their best interests as the evidence establishes that the respondent mother lacks insight into her mental health condition and how her behavior plays a role in whether the subject children can be safely released to her care. It was evident from the respondent mother's testimony that she feels extremely frustrated having to engage with the agency and visit with the children under supervision, and it is reasonable that the respondent mother would feel that way. However, during the respondent mother's testimony, the Court observed that she was unable to effectively regulate her emotions as she was evasive and irritable, with counsel and the Court, and that the respondent mother has failed to meaningfully benefit from her therapeutic services. Indeed, the respondent mother testified that she did not understand why a neglect case was brought against her in the first place or why she had to have visits supervised by the agency, and this was after months of attending therapy sessions. Further, the respondent mother testified that she was only engaged in therapy due to "threat and coercion" and not because she wants to engage in therapy or because she believes that she has any issues to address. Moreover, Dr. E.W.'s report also establishes that the respondent mother lacks insight into her mental health and behavior. Initially, Dr. E.W. reported that the respondent mother was quick to anger with the subject children during some of the visits and did not know how to appropriately communicate with the subject children. Additionally, Dr. E.W. reported that at one point during one of the visits, the respondent mother disappeared to another part of the library, out of sight and earshot of the subject children, without letting them or Dr. E.W. know where she was going.
Finally, placement of the subject children is in their best interests as they have remained placed in foster care, residing with their maternal great aunt, since they were initially removed on April 21, 2022, and their needs are being met. Indeed, the maternal great aunt ensures that the subject children's medical appointments are up to date and that they are regularly attending school. The subject children are thriving in her care and A.F. has consistently stated, since summer 2023, that she wants to continue residing with the maternal great aunt. The maternal great aunt is not only the placement resource for the subject children but is also a resource for supervised visitation between the subject children and the respondent mother and the maternal great aunt is willing to continue to be a supervision resource so that the respondent mother can spend time with her children outside of the agency. Additionally, the attorney for the subject children strongly supports placement of the subject children with the Commissioner of ACS and for the subject children to continue to reside in the home of their maternal great aunt.
Based on the foregoing, it is hereby
ORDERED that the subject children are placed in the care and custody of the Commissioner of ACS until the completion of the next permanency hearing; and it is hereby
ORDERED that the respondent mother is to comply with the following conditions and orders:
• The respondent mother is to continue to engage in her mental health services and follow all recommendations stemming therefrom, including medication management, if clinically indicated;
• The respondent mother is to complete a mental health evaluation and the clinician is to be provided a copy of the redacted neglect petition and the February 13, 2024 fact-finding order;
• The respondent mother is to engage in an anger management course, which may be incorporated into her individual therapy;
• The respondent mother is to regularly and consistently visit with the subject children, as the Court permits and the agency has discretion to expand to unsupervised visitation on 10 days written notice to counsel;
• The respondent mother is to provide the agency with her current address and contact information and notify the agency of any changes in address and contact information;
• After consultation with counsel, the respondent mother is to cooperate with, and sign all consents for, any necessary medical treatment, mental health treatment and educational planning for the subject children;
• The respondent mother is to sign all HIPAAs for the agency so the agency can verify the respondent mother's engagement in services; and
• The respondent mother is to comply with reasonable referrals on notice to counsel.
This constitutes the decision and order of the Court.
Dated: February 4, 2025
New York, NY
Hon. Yael Wilkofsky, JFC